## APPEAL OF DETROIT VAPOR STOVE COMPANY.

Docket No. 5663.     Decided September 25, 1926.

The amounts deducted by the petitioner as salaries of officers and employees for the taxable year were reasonable, and the income and profits-tax return for such year was made without fraudulent intent.

*Jesse I. Miller, Esq.*, for the petitioner.
*Harold Allen, Esq.*, for the Commissioner.

The Commissioner has asserted a deficiency in income and profits taxes for the fiscal year ended June 30, 1920, in the amount of $33,860.92, to which he has added $16,930.46 as a penalty for alleged fraud. The controversy arises (1) from the Commissioner's determination that certain amounts alleged to have been paid as salaries to officers and employees of the petitioner are unreasonable and incommensurate with services respectively rendered, and (2) that a part of such amounts was, in fact, a distribution of treasury stock, in the guise of salaries, made for the purpose of securing unauthorized deduction from the petitioner's gross income for the taxable year, and that the income and profits-tax return in which such deductions were made for the benefit of the petitioner was false and fraudulent.

### FINDINGS OF FACT.

The petitioner was incorporated under the laws of Michigan in 1895 by John S. Sherman and George H. Harms, for the manufacture and sale of vapor oil stoves, under patents previously granted them. Sherman's two sons and Harms' three sons were taken into the business in 1900, and since then the fathers and their five sons have devoted all their time to it. Since 1900 all have been stockholders in the company. Three of them have been directors for many years. C. J. Scheiman of Ft. Wayne, Ind., the third largest stockholder, is also a director. He attended the annual meetings of the board of directors, visited the plant two or more times each year, and had rendered very valuable services in the conduct of the business, especially in regard to financial matters. P. C. Dulitz owned one share of common stock in 1920.

The common stock was owned as follows:

|  | Shares. |
|---|---|
| G. H. Harms, Sec. & Treas | 4,067 |
| J. S. Sherman, President | 3,297 |
| C. J. Scheiman, Director | 3,046 |
| L. A. Sherman, Gen'l. Supt | 1,975 |
| A. G. Sherman, Gen'l. Manager | 976 |
| E. P. Harms, Vice President | 868 |
| A. G. Harms, Asst. Sec | 410 |
| O. C. Harms, Collection Mgr | 360 |
| P. C. Dulitz | 1 |
| Total | 15,000 |

For more than twenty years the growth of the business was comparatively slow. The first few years the sales averaged about $50,000, but by 1914 had increased to $300,000. In 1916 the company inaugurated an extensive system of national advertising which resulted in a rapid expansion and increase in the volume of business. Beginning with 1917 the sales in round figures were as follows:

1917_____ $670, 000
1918_____ 1, 000, 000
1919_____ 2. 000, 000
1920_____ 3, 200, 000

The number of employees for these years were approximately—

|  | Factory | Salesmen on the road | Office force | Total |
|---|---|---|---|---|
| 1917_____ | 300 | 50 | 10 | 360 |
| 1918_____ | 325 | 60 | 14 | 399 |
| 1919_____ | 600 | 80 | 20 | 700 |
| 1920_____ | 775 | 100 | 28 | 903 |

The salaries as fixed for the company's executives during the four years of expanding business from 1917 to 1920, inclusive, were as follows:

|  | 1917 | 1918 | 1919 | 1920 |
|---|---|---|---|---|
| J. S. Sherman, president_____ | $4,000.00 | $4,000.00 | $4,000.00 | $25,000.00 |
| G. H. Harms, secretary and treasurer_____ | 4,000.00 | 4,000.00 | 4,000.00 | 25,000.00 |
| A. C. Sherman, general manager_____ | 2,500.00 | 5,000.00 | 5,000.00 | 25,000.00 |
| L. A. Sherman, general superintendent_____ | 2,500.00 | 5,000.00 | 5,000.00 | 25,000.00 |
| E. P. Harms, vice president_____ | 2,000.00 | 3,000.00 | 3,000.00 | 12,500.00 |
| A. G. Harms, assistant secretary_____ | 1,826.16 | 3,000.00 | 3,000.00 | 12,500.00 |
| O. C. Harms, collection manager_____ | 1,743.30 | 3,000.00 | 3,000.00 | 12,500.00 |
|  | 18,569.46 | 27,000.00 | 27,000.00 | 137,500.00 |

The invested capital, net income, percentage of net income to invested capital and percentage of salaries to net income plus salaries were:

|  | 1917 | 1918 | 1919 | 1920 |
|---|---|---|---|---|
| Invested capital_____ | $325,371.41 | $502,519.95 | $581,315.54 | $686,759.89 |
| Net income_____ | $72,794.95 | $82,999.25 | $85,205.57 | $224,372.08 |
| Percentages: |  |  |  |  |
| Net income to invested capital_____ | 22.4— | 15.5+ | 14.7— | 32.7— |
| Salaries to net income plus salaries_____ | 20.0+ | 25.0+ | 24.0+ | 38.0 |

In order to meet the large seasonal demand of the business for cash during the months of April, May, and June, each executive was paid only about one-half of his salary, monthly, from the beginning of the year. This was called his " drawing account." At or near the close of the fiscal year he could draw the remainder. All were encouraged, however, to leave what they could in the business— not as donations, but as loans. The company was a heavy borrower, usually at 90 days, and not infrequently its collections were slow. The dealers in its stoves usually stocked up for the ensuing year during the early spring months, and when, as sometimes occurred, they were slow in meeting their bills, the petitioner found it quite difficult to meet its own obligations. A very large percentage of the

April and May orders were for immediate delivery. This required that the manufacturer have a large stock on hand by April 1, and that it meet payments for materials and labor before it received any large amounts from its customers. On June 30, 1920, the petitioner had outstanding $800,000 on 90-day notes, and other bills payable amounting to more than $200,000 of which some were overdue. Against these it had $90,000 cash, $750,000 accounts receivable, due in from two to four months, and $750,000 worth of raw materials and goods in process of manufacture. Collections were slow and dealers were not purchasing beyond their known needs. There was a considerable slump in sales during the last four months of the fiscal year.

The sons of Sherman and Harms demanded increased pay for their services as executives. Their fathers, who had retained for themselves the authority to fix salaries, granted an increase from 50 to 100 per cent to the younger men but made no change in their own pay. This arrangement continued throughout the fiscal year 1919. The fiscal year ended June 20, 1920, began remarkably well. At the end of the first six months it was evident that total sales for the year would exceed $3,000,000 in volume. Some time in January, 1920, the younger executives again demanded an increase in salaries which was granted and by proper corporate action salaries were fixed for the elder Harms and for each of the three Shermans at $25,000, and each of the three younger Harms at $12,500 for the fiscal year, but the amounts withdrawn during such year were little, if any, in excess of the salary withdrawals in previous years.

A slump in business developed in the late spring months of 1920; by June there was a general and growing business depression, and the financial affairs were in such condition that it became apparent that the salaries fixed in January could not be paid without jeopardizing the credit and the solvency of the petitioner. All the executives drew as little as possible against their salary accounts with the result that at the end of the year their credit balances on the books were, respectively:

| | |
|---|---|
| J. S. Sherman | $27,604.00 |
| E. P. Harms | 24,349.42 |
| L. A. Sherman | 24,114.35 |
| G. H. Harms | 23,666.50 |
| A. G. Sherman | 20,305.77 |
| O. C. Harms | 11,220.00 |
| A. G. Harms | 9,554.00 |
| Total | 140,814.04 |

The company had in June, 1920, unissued preferred capital stock of the par value of $113,760. It was agreed by proper corporate action that this should be issued in liquidation of the salary credits,

with certain exceptions, the creditors to take the stock at par pro rata to the credits in their favor. E. P. Harms, although his salary for the year 1920 was only $12,500, had credit at the close of the year of $24,349.42, which was slightly in excess of 17 per cent of the total credits. The credit of J. S. Sherman was $2,604 in excess of his salary and that of each of the others from $900 to $4,700 less than his individual salary. The actual value of the preferred stock was about 70 per cent of par. E. P. Harms objected to taking 17 per cent of the preferred stock, and it was agreed that he should take 13 per cent and that the 4 per cent difference should be divided equally among G. H. Harms and the three Shermans. The distribution was made on or about June 30, 1920, and was as follows:

| | June 30, 1920, credit balances before applying preferred stock | Per cent of total credit balance | Per cent of division of preferred stock | Preferred stock applied against credit balances |
|---|---|---|---|---|
| A. G. Harms | $9,554.00 | 7 | 7 | $8,000.00 |
| E. P. Harms | 24,349.42 | 17 less 4 per cent | 13 | 14,800.00 |
| G. H. Harms | 23,666.50 | 17 plus 1 per cent | 18 | 20,500.00 |
| O. C. Harms | 11,220.00 | 8 | 8 | 9,000.00 |
| A. G. Sherman | 20,305.77 | 14 plus 1 per cent | 15 | 17,000.00 |
| J. S. Sherman | 27,604.00 | 20 plus 1 per cent | 21 | 24,000.00 |
| L. A. Sherman | 27,114.35 | 17 plus 1 per cent | 18 | 20,460.00 |
| Total | 140,814.04 | 100 | 100 | 1 113,760.00 |

1 All of the unissued preferred stock.

In the latter part of July, 1920, at an informal meeting of five of the resident stockholders, the question arose as to whether the corporation should pay C. J. Scheiman some compensation for his valuable services to the company. It was decided that a payment of $13,000 would be a fair recognition of such services, and that such amount should be paid to him. On August 12, 1920, the regular directors' meeting was held, and, for the first time, the matter was brought to the attention of Scheiman. It was decided that the stockholders who had received the preferred stock in June on account of credit balances on their salary accounts should sell to the company, pro rata, $13,000 par value of their stock, taking credit on the company's books therefor, and that such stock should be reissued to Scheiman. This was done.

The petitioner filed its income-tax return for the taxable year in November, 1920, and deducted from its gross income the amount of $137,500, which was the total of salaries authorized for the year for the seven executives involved. Of this amount, $62,500, the total of salaries authorized for the president, vice president, and secretary-treasurer, was included under the head of "Officers Salaries" and the balance was included under the head of "Office Salaries." Upon audit of such return, the Commissioner disallowed $110,500 of such

deductions, and held that the payment of the authorized salaries in the manner hereinbefore set forth was an issue of capital stock in the guise of salaries for the purpose of securing an unauthorized deduction from gross income for the benefit of the petitioner, and that the return in which such deduction was taken under the heads of " Officers Salaries " and " Office Salaries " was false and fraudulent.

Each of the seven executives involved in this proceeding included the preferred stock received in liquidation of his salary credit in his income-tax return for the calendar year 1920 at the market value of such stock at the date of its receipt, which was about 70 per cent of its par value.

The balance sheets of the petitioner as of June 30, 1919, and June 30, 1920, are as follows:

BALANCE SHEET

|  | June 30, 1919 | June 30, 1920 |
|---|---|---|
| **ASSETS** | | |
| Cash | $1,119.49 | $92,281.60 |
| Liberty bonds | 11,238.56 | 11,488.56 |
| War-savings stamps | 422.00 | 422.00 |
| Accounts receivable | 456,679.40 | 912,322.88 |
| Good will | 148,590.47 | 148,590.47 |
| Inventories | 206,844.52 | 086,910.17 |
| Boat material | 38,422.05 | |
| Real estate: | | |
|   Franklin Street | 47,875.00 | 54,160.00 |
|   Kercheval Avenue | 54,580.00 | 54,580.00 |
| Buildings: | | |
|   Franklin Street | 59,562.88 | 60,277.88 |
|   Kercheval Avenue | 99,787.82 | 145,065.21 |
| Building equipment: | | |
|   Franklin Street | 18,058.74 | 18,058.74 |
|   Kercheval Avenue | 37,738.28 | 53,341.03 |
| Machinery | 127,740.14 | 194,757.65 |
| Tools and dies | 20,500.00 | 20,500.00 |
| Patterns | 13,349.50 | 13,349.50 |
| Factory fixtures and equipment | 21,733.86 | 26,631.98 |
| Office furniture and fixtures | 11,530.17 | 17,928.66 |
| Motor trucks | 6,157.80 | 6,952.97 |
| Patents | 19,500.00 | 19,500.00 |
| Deferred charges: | | |
|   Advertising | | 4,392.08 |
|   Printing and stationery | 1,735.85 | 2,134.83 |
|   Postage | 669.07 | 113.19 |
|   Insurance | 300.00 | 3,799.09 |
|   Interest | 725.00 | 7,021.39 |
|   Factory expense | 286.78 | 2,815.47 |
|   Light and power | 280.00 | 532.50 |
|   Sales expense | | 649.26 |
|   Boat equipment | 4,908.94 | |
|     Total | 1,410,336.32 | 2,558,577.11 |
| **LIABILITIES** | | |
| First-mortgage bonds | 105,000.00 | 90,000.00 |
| Capital stock: | | |
|   Common | 150,000.00 | 150,000.00 |
|   Preferred | 148,640.00 | 300,000.00 |
| Accounts payable | 121,390.02 | 212,820.97 |
| Bills payable | 148,000.00 | 795,000.00 |
| Contracts, payable, real estate | 6,500.00 | 10,519.32 |
| Taxes, payable, real estate | 470.61 | |
| Commissions payable | 20,806.96 | 14,179.03 |
| Taxes payable, income | 5,427.13 | |
| Reserve for discount and exchange | | 11,221.57 |
| Reserve for depreciation | 105,078.60 | 128,413.02 |
| Surplus appreciation | 38,302.83 | 37,243.28 |
| Surplus | 560,720.17 | 809,179.92 |
|     Total | 1,410,326.32 | 2,558,577.11 |

OPINION.

LANSDON : The case involves two questions.

1. Is the taxpayer's claim of $137,500 as salaries for its seven officials "A reasonable allowance for salaries or other compensation for personal services actually rendered?"

2. Is the Commissioner's claim that the taxpayer's return is " false or fraudulent " sustained by the facts?

Prior to June 30, 1919, the salaries of the officials and employees of the company had been conservatively low. In 1918 and 1919, two executives had received $5,000 each; two others, the president and secretary and treasurer, $4,000 each; and the other three, $3,000 each. Of these amounts, about 50 per cent had been considered by each of the payees as a drawing or checking account, payable semi-monthly, and the balance as not to be paid until near the close of the fiscal year June 30, when the peak of the demand of the company's seasonal need for funds had passed. During each of these years the net income of the company, including the salaries of its officials, was about $100,000. By the end of the calendar year 1919 it was manifest that the sales for the fiscal year would reach, and probably exceed, $3,000,000. The five younger executives, all stockholders of the petitioner and regularly employed in its operations, were of the opinion that their remuneration was entirely incommensurate with the services required and performed. They were devoting all their time, and much overtime, to their duties, often leaving the office or plant as late as midnight. The period was one of inflation, when increasingly high salaries were the rule. They chafed under the comparatively low pay which they were receiving.

The salaries had up to this time been fixed by the two founders of the business. Early in January, 1920, at a general informal meeting of the officials, the sons freely expressed their discontent and demanded compensation ranging from $12,500 to $25,000 per year. The fathers took the matter under consideration, and, in a few days, announced that they had increased their own salaries and those of the general superintendent and general manager to $25,000 each per year, and those of the three younger Harms to $12,500 each, and that such increases would be effective for the fiscal year ending June 30, 1920. This was a regular and legal determination of the salaries. *Appeal of Reub Isaacs & Co.,* 1 B. T. A. 45; *Appeal of Max Levy & Co.,* 3 B. T. A. 422.

Taking into consideration the rapid expansion and the great volume of the business of the petitioner, the increased compensation was not incommensurate with the services and responsibilities of the executives. In view of this fact, and the facts that the salaries previously paid were meager, that the petitioner was a close corporation,

and that the net profit available for dividends after the deduction of the increased salaries was nearly 33 per cent of the invested capital, we are of the opinion that the salaries, regularly determined in January, 1920, for the fiscal year ended June 30, 1920, in the total amount of $137,500, were reasonable, and that the taxpayer was entitled to deduct such amount from its gross income in making its income and profits-tax return for each year.

The increased salaries for the fiscal year ended June 30, 1920, legally determined by the directors, created an enforceable liability against the petitioner. Unfavorable business conditions due to the curtailment of credits throughout the country, beginning about the first of May, 1920, made it impossible for the petitioner to pay such salaries in cash without seriously endangering its credit and solvency. Mail orders had diminished in volume, collections were slow, and the petitioner's cash position was a matter of grave concern to its executives even before June 30. At that date it had cash obligations due within the next three months in excess of $1,000,000, and its available cash was less than $100,000. Its profits from the year, in excess of $200,000, were frozen in accounts receivable and inventories. In these circumstances it was no more than sound and prudent business procedure to liquidate indebtedness by the issue of preferred stock to creditors willing to accept such payment.

The amount of $13,000 paid to C. J. Scheiman is not involved in this controversy. It was neither authorized nor paid in the taxable year, nor does it appear from the record that it was deducted from the gross income of the petitioner for such year. We are without any clear evidence as to how this amount was treated, either by the petitioner in the income and profits-tax returns for the year involved or by the Commissioner upon the audit of such returns, but we are convinced that regardless of the propriety of such payment the amount thereof is not a proper deduction from the petitioner's gross income for the taxable year.

The evidence is conclusive that the salaries paid to the executives of the petitioner for the year ended June 30, 1920, in the amount of $137,500 were reasonable, and that its income and profits-tax return for such year was not false and fraudulent.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*